UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| JEREMY J. ROUBIDEAUX, | ) | |
| | ) | |
| Plaintiff, | ) | CIV. 10-4126-JLV |
| | ) | |
| vs. | ) | |
| | ) | |
| ROBERT DOOLEY, | ) | |
| Warden, Mike Durfee State Prison; | ) | **REPORT AND RECOMMENDATION** |
| ED LIGTENBERG, SD Board of | ) | |
| Pardons and Paroles; | ) | |
| SAM BADURE, Parole Agent; | ) | |
| LELAND TJEERDSMA, Special | ) | |
| Security, Mike Durfee State Prison; | ) | |
| TIM REISCH, Sec. of Correction; and | ) | |
| SUE JACOBS, Assoc. Warden, | ) | |
| Mike Durfee State Prison, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**INTRODUCTION**

Plaintiff Jeremy Roubideaux is an inmate at a South Dakota state penitentiary.  He brings this civil rights lawsuit pursuant to 42 U.S.C. § 1983 against defendants, who are various prison officials and employees.  The district court, the Honorable Jeffrey L. Viken, referred the matter to this magistrate judge for a recommended disposition, pursuant to 28 U.S.C. § 636(b)(1)(B) .

1

## FACTS

### A.   Background

Plaintiff Jeremy Roubideaux is an inmate in the custody of the state of

South Dakota at the Mike Durfee State Penitentiary ("MDSP") in Springfield,

South Dakota.  See Docket No.  58, ¶ 1 (Defendants' Statement of Undisputed

Material Facts).  Defendant Robert Dooley is the warden at MDSP and

defendant Sue Jacobs is an Associate Warden at MDSP.  Id. at ¶ 4.  Defendant

Ed Ligtenberg is a member of the South Dakota Board of Pardons and Paroles

("Parole Board") and Sam Badure was employed by that entity as

Mr. Roubideaux's parole officer in 2010 when his parole was revoked.  Id. at

¶ 4.  Defendant Tim Reisch is the former Secretary of the South Dakota

Department of Corrections.  Id.  Defendant Leland Tjeerdsma is a special

security officer at MDSP.  Id.

Mr.  Roubideaux has seven convictions for driving under the influence

("DUI") and one conviction for possession of methamphetamine.  Id. at ¶ 33.

When he was convicted of his fourth and fifth DUIs, he was sentenced to two,

two-year sentences of incarceration, each sentence to run consecutively.  Id. at

¶¶ 33-35.  This four-year term of incarceration was begun on May 26, 2002,

and was to end on May 26, 2006.  Id.

On January 9, 2004, Mr. Roubideaux was paroled.  Id. at ¶ 36.  He

violated parole by committing his sixth DUI on July 22, 2004.  Id. at ¶ 37.  His

2

parole was revoked and he was returned to prison.  Id. at ¶¶ 38-39.
Mr. Roubideaux had spent 6 months and 20 days on parole-- "street time" that
would otherwise have counted against the running of his four-year term of
imprisonment.  Id. at ¶¶ 39-41.  The Parole Board revoked all but 8 days of
Mr. Roubideaux's street time as part of his parole revocation proceedings.  Id.
Prior to his parole being revoked, the Parole Board notified Mr. Roubideaux
that, if the Parole Board found that he had violated the terms of his parole, he
could lose credit for any "street time" spent on parole.

Mr. Roubideaux was sentenced to five years imprisonment on his
seventh[1] DUI and possession of methamphetamine charge, which sentence was
to run consecutively to Mr. Roubideaux's term of incarceration on the previous
DUIs and parole revocations.  Id. at ¶ 42.  This latest sentence was to begin
running on December 8, 2006, and end on December 8, 2011.  Id.

Mr. Roubideaux was again paroled on December 24, 2007.  Id. at ¶43.
He violated parole two years later on February 17, 2010, by using a controlled
substance and drinking alcohol.  Id. at ¶ 44.  Mr. Roubideaux had been on

---

[1]No mention is made in defendants' statement of facts as to the sentence,
if any, meted out for Mr. Roubideaux's sixth DUI.

parole for a total of one year, eight months, and twenty-nine days.  Id. at ¶ 45.[2]
The Parole Board again revoked Mr. Roubideaux's parole, and took away three
months "street time" from this second period of parole supervision.  Id. at ¶ 46.
As a result of Mr. Roubideaux's various court-imposed sentences and the
Parole Board's revocation of street time, his current release date is March 8,
2012.  Id. at ¶ 47.

**B.  Mr. Roubideaux's Complaint and Defendants' Unopposed Facts**

Mr. Roubideaux filed his complaint pursuant to 42 U.S.C. § 1983 on
August 31, 2010, during this most recent term of incarceration following his
February, 2010, violation of the conditions of parole.  In that complaint, the
court perceives eight separate claims.

**1.  Arch Supports**

Mr. Roubideaux asserts that on July 16, 2010, he requested orthotic
arch supports from the infirmary at MDSP.  Docket No. 1, at 3.
Mr. Roubideaux asserts that his request was denied because he was not
employed while incarcerated and therefore could not pay for the arch supports.

---

[2]Counting from the date defendants assert Mr. Roubideaux was paroled
until the date of his violation, it would seem Mr. Roubideaux had been on
parole in excess of two years.  However, defendants assert that he was on
parole for one year, eight months and twenty-nine days.  The discrepancy
between the date of parole and date of violation is not explained to the court.
However, since Mr. Roubideaux does not contest defendants' statement of this
fact, the court accepts the one-year-plus figure as an accurate statement of the
facts.

4

Defendants filed a statement of undisputed facts in support of their motion for summary judgment.  Mr. Roubideaux has not contradicted that statement of facts.  Defendants assert in their statement of undisputed facts that Mr. Roubideaux initiated a sick call on July 16, 2010, in which he complained of knee pain because of a lack of arch supports in his shoes.  See Docket No. 58 ¶ 13.  The nurse who saw Mr. Roubideaux explained that she would discuss Mr. Roubideaux's request with her supervisor.  Id. at ¶ 14.

Only a few hours later, Mr. Roubideaux filed an informal resolution request, complaining that his request for arch supports had been denied because he did not have a job and could not pay for them.  Id. at ¶ 15.  The MDSP health staff reviewed the grievance and told Mr. Roubideaux that an appointment would be made for him to see a medical provider within two to three weeks to determine whether he needed arch supports.  Id. at ¶¶ 16-17. Mr. Roubideaux was informed that if the medical provider believed he needed arch supports, they would be given to him.  Id.  Two days later and before any medical appointment could take place, Mr. Roubideaux filed a request for administrative remedy, repeating his same complaint.  Id. at ¶ 18.

Susan Jacobs reviewed this request for administrative remedy and was told by medical staff of Mr. Roubideaux's upcoming appointment to see a medical care provider that had been scheduled for him.  Id. at ¶ 19.  On July

22, 2010, Warden Dooley responded to the request for administrative remedy by telling Mr. Roubideaux of his upcoming appointment.  Id. at ¶ 20.

Mr. Roubideaux's promised appointment took place on July 30, 2010, when he was seen by Physician's Assistant Michael Hanvey.  Id. at ¶ 21. Mr. Roubideaux told Hanvey during the appointment that he no longer needed medical arch supports because Warden Dooley had authorized Roubideaux to purchase the arch supports himself.  Id.

### 2.    Medical Charges for Chronic Conditions

Mr. Roubideaux also asserts that he is being required to pay for medical care he receives while incarcerated, "even on cronic [sic] care."  See Docket No. 1, page 3.  Mr. Roubideaux does not specify what conditions, if any, he suffers from aside from the arch support issue discussed above.  Mr. Roubideaux does not tell the court what dates he received treatment or what the charges for that treatment were.  Mr. Roubideaux never pursued any administrative remedies regarding this grievance other than the specific grievance related to the arch supports as discussed above.

Defendants have provided the court with their policy regarding payment by inmates for medical care.  See Docket No. 64-6.  It is the official policy of the South Dakota Department of Corrections that no inmate will be refused medically necessary health care, regardless of ability to pay.  Id. at 1.  Inmates are, however, charged a co-pay for various levels of medical attention.  Id.

6

at 1 to 6.  The amount of the charge depends on the nature of the service and on whether the inmate has a job in a work release program or not.  Id.  The co-pay is then deducted from the inmate's institutional account.  Id.  If the inmate has insufficient funds to cover the co-pay, the account is allowed to show a negative balance.  Id.  If an inmate disagrees with a charge, he may seek review through the administrative remedy procedure.  Id.

There are numerous items and services for which inmates are charged nothing, including prescriptions, emergency medical treatment, exams necessitated by an assault, mental health screenings, follow-up visits, and admissions screenings.  Id. at 2, ¶ C.  Specifically exempted from the co-pay requirement is medical treatment for the chronic conditions of asthma, diabetes, high blood cholesterol, HIV, hypertension, seizure disorder, and tuberculosis.  See Docket No. 58, ¶ 61.

### 3.    Denial of "Street Time"

Mr. Roubideaux calculates that his court-imposed sentences come to a total of nine years:  two years each for the fourth and fifth DUIs, totaling four years; plus five years for the seventh DUI and possession of methamphetamine charges.  Because he began serving this series of sentences on May 26, 2002, Mr. Roubideaux calculates that he should have been released on December 28,

2010.  Id. at ¶¶ 51-54.[3]  He argues that the Parole Board violated his constitutional rights by taking away his "street time" credit while he was out on parole and extending his term of incarceration beyond that which the sentencing court ordered.  Id.; see also Docket No. 1, at page 3.

Mr. Roubideaux never filed any grievance or other complaint within the prison administrative system regarding this claim.  He did not attempt to appeal the decision in any court of law, save this lawsuit.  Id. at ¶ 55.

He did, however, send a letter to the Governor of South Dakota, Dennis Daugaard, on November 5, 2010, setting forth his complaints.  See Docket No. 63-3, pages 23 and 24.  In that letter, Mr. Roubideaux represents that, in addition to writing to Governor Daugaard, he also sent letters to the Secretary of Corrections and to former-Governor Michael Rounds as well as filed a petition for a writ of habeas corpus regarding the calculation of his discharge date.  Id.

### 4.     Conflict of Interest of Sam Badure

Mr. Roubideaux alleges that due process requires that probable cause for revocation of parole can only be established through the use of testimony by one "not directly involved in the case," and that the use of Sam Badure's testimony against him therefore violated due process   See Docket No. 1 at 3.

_____

[3]Mr. Roubideaux was also given credit for pre-sentence time served of 153 days.

In defendants' statement of undisputed facts, they indicate that Mr. Badure was Mr. Roubideaux's parole officer in February, 2010, when Mr. Roubideaux violated conditions of parole for the second time. See Docket No. 58 at ¶¶ 44-49. Defendants assert that Mr. Badure presented the Parole Board with a report regarding Mr. Roubideaux's violation of parole, and made a recommendation regarding action he thought the Parole Board should take, but that the Parole Board itself made the decision regarding Mr. Roubideaux's parole status and that Mr. Badure did not participate in that decision. Id. No grievance of any kind was filed by Mr. Roubideaux within the prison's administrative grievance system to protest his assertion of Mr. Badure's involvement in his parole revocation. No appeal was filed with any court regarding this issue.

**5.     Retaliation by Leland Tjeerdsma**

Mr. Roubideaux asserts that on June 10, 2010, Leland Tjeerdsma violated his right to due process, in that Mr. Tjeerdsma told Roubideaux that he "need[s] to watch what [he's] doing." Docket No. 1, at 4. Mr. Roubideaux believes this alleged statement came in retaliation for his filing of grievances. The court notes that the only other allegation made by Mr. Roubideaux for which he filed a grievance was the allegation regarding the denial of his arch supports. That grievance was filed in July, 2010, one month *after* the statement allegedly made by Mr. Tjeerdsma. Therefore, Mr. Tjeerdsma's

statement, if it was related to a grievance filed by Mr. Roubideaux, could not have been related to the grievance regarding the arch support because that grievance had not yet been made.

Defendants place the statement Mr. Roubideaux attributes to Mr. Tjeerdsma in context by citing to the informal resolution request made by Mr. Roubideaux regarding this issue.  In that document, Mr. Roubideaux related that Mr. Tjeerdsma told Mr. Roubideaux that he thought Mr. Roubideaux was hanging around with the wrong crowd and that he was not a good person like he used to be.  See Docket No. 58, ¶ 23; Docket No. 64-1, page 19.

Mr. Tjeerdsma neither admits nor denies making the statement attributed to him by Mr. Roubideaux, as he has no memory of it.  See Docket No. 58, ¶ 29.  Mr. Tjeerdsma admits that, on other occasions, he has given inmates "friendly and helpful advice" to avoid trouble by considering who they pick as their friends.  See Tjeerdsma Affidavit, Docket No. 61, ¶ 3. Mr. Tjeerdsma denies that the comment, if it was made, was related in any way to Mr. Roubideaux's filing of grievances or lawsuits.  Id. at ¶ 4.

Mr. Roubideaux filed both an informal resolution request as well as a request for administrative remedy in connection with this allegation.  The remedy Mr. Roubideaux requested was that Mr. Tjeerdsma be disciplined.

10

Defendants do not state in this record what action, if any, they took on

Mr. Roubideaux's administrative requests.

### 6.    CBM Food Service Care Packages Overcharging

Mr. Roubideaux makes assertions that Sue Jacobs and Tim Reisch

violated S.D.C.L. 1-1A-2, in that they took no action to stop "overcharging" by

CBM for the care packages available for third parties to purchase for inmates.

Roubideaux characterizes this as "stealing money from an inmate's account" by

CBM and, by extension, by Jacobs and Reisch.

Defendants explain in their statement of undisputed facts that CBM

provides care packages which are available for third parties to purchase to give

to inmates.  See Docket No. 58, ¶¶ 65-70.  Mr. Roubideaux filed an informal

resolution request regarding this issue, but did not follow up with a request for

an administrative remedy.  Id.  In his informal resolution request,

Mr. Roubideaux complained that CBM charged purchasers $15.00 for the care

packages, but that the actual cost of the items in the packages varied from

$15.03 to $14.03, and, thus, he argued, CBM was "overcharging."  Id.

Defendants explain that inmates are not eligible to purchase care

packages from CBM.  Id.  Instead, the transaction is a wholly private one

between CBM and a third party.  Id.

11

### 7.     Confiscation and Reading of Mr. Roubideaux's Legal Papers

Mr. Roubideaux next asserts that defendant Leland Tjeerdsma illegally confiscated and read legal documents which Mr. Roubideaux had given to another inmate to proofread.  See Docket No. 1 at 5.  Mr. Roubideaux asserts that Warden Dooley condoned these actions by prison employees.  Id.  Mr. Roubideaux filed an informal resolution request on June 25, 2010, regarding this allegation, but did not follow up by filing any request for administrative remedy.  See Docket No. 64-1, page 15.[4]

Defendants assert in their statement of facts that inmates are not allowed to possess the legal papers of another inmate.  See Docket No. 58 at ¶¶ 71-74.  Such items are considered by the Depart of Corrections to be contraband and subject to seizure.  Id.  Defendants admit that they seized Mr. Roubideaux's habeas papers when they were discovered in the possession of another inmate.  Id.  Defendants also note that Mr. Roubideaux himself

---

[4]Defendants assert in their statement of undisputed facts that Mr. Roubideaux filed no grievance at all with regard to this issue.  See Docket No. 58, ¶ 72.  In their brief, however, defendants indicate that Mr. Roubideaux filed a request for informal resolution.  See Docket No. 57 at page 6. Defendants provided to the court a complete copy of all of the grievances Mr. Roubideaux has filed from 2003 through November, 2010.  See Docket No. 64-1, and 64-2.  Nestled among those voluminous grievances is one regarding this issue.  See Docket No. 64-1, page 15.  Although an informal resolution request was filed, no request for administrative remedy appears to have been filed.  Id.

admits that prison staff returned his legal papers to him later that same
month.  Id.

### 8.    Charges for Legal Copies and Toiletries

Mr. Roubideaux's last claim is that defendants violated his constitutional
rights by charging his inmate account for toiletries and photocopies.  See
Docket No. 1.  Mr. Roubideaux asserts that items such as these should be
provided to him free of charge.  Id.

Defendants assert in their statement of undisputed facts that
Mr. Roubideaux never filed any administrative grievances regarding this issue.
They further set forth their policy with regard to these two items.

Defendants assert that each indigent inmate can have $10.00 worth of
free legal copies each month at a rate of $0.15 per page.  See Docket No. 58 at
¶79; Docket No. 64-8, page 5, ¶ B.[5]  If the inmate is faced with an imminent
deadline and he has exhausted his $10.00 in copies for that month, he may
request additional copies.  Id.

Defendants assert that MDSP policy allows indigent inmates to receive
certain items from the commissary even if the inmate does not have funds to
pay for them.  Id.  The charge for those items is levied against the inmate's

---

[5]This would amount to 66 pages of copies per month per indigent inmate
altogether free of charge.

prison account and is collected if and when the inmate is no longer considered indigent.  Id.

\* \* \* \* \* \* \* \* \* \* \*

Respondents have moved for summary judgment on all of Mr. Roubideaux's claims on various grounds.  Mr. Roubideaux resists the motion.  The following is this court's recommended disposition.

## DISCUSSION

### A.    Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, a movant is entitled to summary judgment if the movant can "show that there is no genuine issue as to any material fact and that [the movant] is entitled to judgment as a matter of law."  In determining whether summary judgment should issue, the court views the facts, and inferences from those facts, in the light most favorable to the nonmoving party.  See Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).  The burden is placed on the moving party to establish both the absence of any genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).

Once the movant has met its burden, the nonmoving party may not simply rest on the allegations in the pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); FED. R. CIV.

14

P. 56(e)(each party must properly support its own assertions of fact and properly address the opposing party's assertions of fact, as required by Rule 56(c)).  In determining whether a genuine issue of material fact exists, the court views the evidence presented in light of which party has the burden of proof under the underlying substantive law.  Id.  Summary judgment will not lie if there is a genuine dispute as to a material fact, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

The substantive law identifies which facts are "material" for purposes of a motion for summary judgment.  Anderson, 477 U.S. at 247.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  Id. at 248 (citing 10A C. Wright, A. Miller, & M. Kane, FEDERAL PRACTICE AND PROCEDURE § 2725, pp. 93-95 (1983)).  The Supreme Court has further explained that:

> the issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved *conclusively* in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.

Anderson, 477 U.S. at 248-49 (quoting First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 288-89 (1968)(emphasis added)).  Essentially, the availability of summary judgment turns on whether a proper jury question is presented.  See Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).  "The

15

inquiry performed is the threshold inquiry of determining whether there is the need for a trial-whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250.

**B.    Whether Mr. Roubideaux is a "Three Strikes" Plaintiff**

Subsection g of 28 U.S.C. § 1915 provides as follows:

> In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

See 28 U.S.C. § 1915(g).

The effect of a prisoner accumulating "three strikes" under § 1915(g) is that the prisoner must prepay the entire filing fee before any federal court may consider a fourth lawsuit or appeal rather than proceeding *in forma pauperis*. Martin v. Shelton, 319 F.3d 1048, 1050 (8th Cir. 2003).  This provision does not "preclude the inmate from filing additional actions, but does deny him the advantages of proceeding *in forma pauperis*" unless he is in imminent danger of serious physical injury.  Id.

In their statement of undisputed facts, respondents set forth the fact that Mr. Roubideaux has filed at least three previous lawsuits as an inmate, all of which were dismissed.  Those cases are: Roubideaux v. South Dakota,

16

("Roubideaux I") Civ. No. 03-5073; <u>Roubideaux v. Schreier</u>, ("Roubideaux II") Civ. No. 10-5071; and <u>Roubideaux v. Dooley</u>, ("Roubideaux III") Civ. No. 10-4154.  This case would be "Roubideaux IV."

The first case was dismissed for failure to state a claim upon which relief could be granted.  <u>See Roubideaux I</u>, at Docket Nos. 11, 13.  The second was dismissed as frivolous and failing to state a claim.  <u>See Roubideaux II</u>, Docket No. 8.

The third case was dismissed for failure to state a claim upon which relief could be granted.  <u>See Roubideaux III</u>, at Docket No. 6.  In so dismissing the third case, the district court notified Mr. Roubideaux that he had thereby accumulated his third strike under the Prison Litigation Reform Act, 28 U.S.C. § 1915(g), and that he would no longer be allowed to litigate *in forma pauperis* unless he fell under the imminent danger exception.  <u>Id.</u>

<u>Roubideaux III</u> was dismissed on December 16, 2010.  <u>Id.</u>  The instant case was filed by Mr. Roubideaux on August 31, 2010, three months before the dismissal in <u>Roubideaux III</u>.  Accordingly, this court granted Mr. Roubideaux's motion to proceed *in forma pauperis* on November 19, 2010, one month before his third dismissal.  <u>See</u> Docket No. 12 in Civ. No. 10-4126.  "Section 1915(g) does not apply unless the inmate litigant has three strikes *at the time he files* his lawsuit or appeal."  <u>Campbell v. Davenport Police Dept.</u>, 471 F.3d 952, 952-53 (8th Cir. 2006).  Here, Mr. Roubideaux had not accumulated his third strike

at the time he filed the instant complaint.  Therefore, § 1915(g) does not apply in this case to deny him *in forma pauperis* status.  Id.

**C.    Whether Mr. Roubideaux Has Exhausted Administrative Remedies**

Under 42 U.S.C. § 1997e, "no action shall be brought with respect to prison conditions under section 1983 of [Title 42], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  See 42 U.S.C. § 1997e(a).  If a claim is frivolous, malicious, or fails to state a claim upon which relief can be granted, the court may dismiss such claim without requiring administrative exhaustion.  Id. at (c)(2).

The purpose of this provision is to filter out bad claims and facilitate the consideration of colorable claims.  Jones v. Bock, 549 U.S. 199, 203-04 (2007). "Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court." Id. at 204.  The goal is that, by allowing prison officials to address a prisoner's claims first, the number of prisoner lawsuits filed in federal court will be reduced, and for those that are filed, there will be a useful administrative record for the court to refer to.  Id.  Exhaustion of administrative remedies within the correctional facility is mandatory before filing a complaint in federal court.  Id. at 211.

Exhaustion requires that prisoners " 'complete the administrative review process in accordance with the applicable procedural rules,'–rules that are defined not by the PLRA, but by the prison grievance process itself."  Id. at 218 (quoting Woodford v. Ngo, 548 U.S. 81, 88 (2006)).  Failure to file a grievance within the time allowed under prison administrative rules does not constitute "proper exhaustion" of administrative remedies.  Id. (citing Woodford, 548 U.S. at 93-95).  If a prisoner's complaint contains both exhausted claims and unexhausted claims, the court should dismiss the unexhausted claims and proceed to consider on the merits those claims that have been exhausted.  Id. at 223-24.

Defendants have filed with the court the policy of the South Dakota Department of Corrections regarding inmates' administrative remedies.  See Docket No. 64-5.  Under the policy, inmates who wish to complain about a condition in prison or a disciplinary decision must first make an informal resolution request.  Id. at page 3.  This step is mandatory.  Id.  An informal resolution request must be made within 30 days of when the action or condition arose.  Id. at pages 2-3.

Prison staff must then respond in writing to the inmate's informal resolution request within five working days.  Id. at 3.  If the inmate is not satisfied with the prison's response to his informal resolution request, he must pursue the second step, which is the filing of a request for administrative

19

remedy.  Id.  The request for administrative remedy must be filed within five working days of the inmate's receipt of the prison's written response to his request for informal resolution.  Id. at page 4.  Prison officials have 30 days upon receipt of a request for administrative remedy to provide the inmate a written response thereto.  Id.

If the inmate is not satisfied with the prison's response to his request for administrative remedy, and if the action concerns his sentence discharge date, a major disciplinary action, or the restoration of good time, the inmate may appeal to the Secretary of Corrections.  Id. at pages 4-5.[6]

Of the eight claims raised by Mr. Roubideaux in his complaint, he exhausted his administrative remedies as to only two of those claims:  (1) the claim that his constitutional rights were violated by the prison's denial of his request for arch supports and (2) the claim that Leland Tjeerdsma retaliated against him for filing grievances.   Mr. Roubideaux failed to initiate any administrative complaints of any kind regarding four of his claims, and failed to go beyond the informal resolution request stage for two other claims.[7]

_____

[6]This step uses the term "may," so even though it is an available remedy for more serious issues, inmates do not appear to be required to take this step. Defendants do not argue that Mr. Roubideaux should have taken this third step in order to exhaust his administrative remedies.

[7]The two claims on which Mr. Roubideaux submitted requests for informal resolution were the CBM claim and the confiscation of his legal papers from the other inmate's cell.

Therefore, the court will consider on the merits only the two claims on which

Mr. Roubideaux has exhausted his administrative remedies.  Jones, 549 U.S.

at 219;  Woodford, 548 U.S. at 93-95.  The court recommends granting

defendants summary judgment on the other six claims due to

Mr. Roubideaux's failure to exhaust.

**D.     Denial of Arch Supports**

Section 1983 does not confer substantive rights but merely provides a

means to vindicate rights conferred by the Constitution or laws of the United

States.  Gatlin v. Green, 362 F.3d 1089, 1093 (8th Cir. 2004).  Section 1983

requires a claimant to identify the particular right that has been violated.  Id.

If the claimant fails to allege a violation of a right secured under the

Constitution or laws of the United States, he has not stated a claim upon

which relief may be granted under section 1983.  Isakson v. First National

Bank, 990 F.2d 1098, 1098-99 (8th Cir. 1993).

Mr. Roubideaux does not cite a specific constitutional right he believes

was violated with regard to the arch support issue.  Given the most liberal

possible construction of this issue, Mr. Roubideaux's complaint attempts to

state a claim for a violation of the Eighth Amendment.  The Eighth Amendment

prohibits the infliction of cruel and unusual punishment.  U.S. CONST. amend.

VIII.  A prisoner's allegation of inadequate medical attention was recognized as

a potentially viable claim for a violation of the prohibition against cruel and

unusual punishment, via the section 1983 cause of action.  Estelle v. Gamble,
429 U.S. 97 (1976).  To state a cause of action, the prisoner must sufficiently
allege  "deliberate indifference" to a prisoner's "serious illness or injury." Id. at
104-05.  "This conclusion does not mean, however, that every claim by a
prisoner that he has not received adequate medical treatment states a violation
of the Eighth Amendment." Id. at 105.

      With regard to the "deliberate indifference" requirement, the courts have
made clear that mere negligence or medical malpractice is not enough.  Id. at
105-06.  Likewise, a mere disagreement with a physician's treatment decisions
does not rise to the level of an Eighth Amendment violation.  Id.; Randall v.
Wyrick, 642 F.2d 304, 308 (8th Cir. 1981).  To prevail on a claim of deliberate
indifference, a plaintiff must prove:  (1) he suffered objectively serious medical
needs and; (2) the prison officials actually knew but deliberately disregarded
those needs.  Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997).  To show
deliberate indifference, the plaintiff must show prison officials "knew of, yet
disregarded, an excessive risk to his health." Logan v. Clarke, 119 F.3d 647,
649 (8th Cir. 1997)(citations omitted).  Furthermore, "only those deprivations
denying the minimal civilized measures of life's 'necessities' are sufficiently
grave to form the basis of an Eighth Amendment violation." Wilson v. Sieter,
501 U.S. 294, 298 (1991) (citations omitted).

22

The court notes that Mr. Roubideaux did not contest the defendants' statement of undisputed facts.  In that statement, defendants establish that Mr. Roubideaux was given an appointment with a medical care provider to see if he needed arch supports and that, during that appointment, Mr. Roubideaux himself told the medical care provider that he no longer needed arch supports. Therefore, the factual basis for Mr. Roubideaux's assertion that he was denied arch supports is not established.

Moreover, even if the court were to accept Mr. Roubideaux's assertion that he needs arch supports and was denied, this allegation clearly does not rise to the level of an objectively serious medical need.  See, e.g. Shatin v. Artuz, 28 Fed. Appx. 9, *10 (2d Cir. 2001) (inmate's ankle condition, whether a sprained ankle, bone spur, or neuroma, did not rise to the level of seriousness required by Eighth Amendment); Morris v. McGrath, 2009 WL 4730902 at *3 (N.D. Ca. 2009) (inmate's request for non-orthopedic, commercially available shoes and receipt of a medical appointment in a timely fashion did not support Eighth Amendment violation); McKinnis v. Williams, 2001 WL 873078 at *4 (S.D.N.Y. 2001) (toe injury for which inmate wanted special shoes did not rise to the level of a serious medical need); Alston v. Howard, 925 F. Supp. 1034, 1040 (S.D.N.Y. 1996) (inmate's request for high-performance footwear for chronic ankle pain not sufficiently serious to establish an Eighth Amendment claim).

Moreover, the record establishes that defendants were not deliberately indifferent to Mr. Roubideaux's perceived medical need–in response to his complaint, they set up an appointment within a matter of two to three weeks for him to see a medical care provider.  Given the non-emergency nature of the alleged condition, this response does not constitute deliberate indifference.

Mr. Roubideaux argues that he was unjustly denied arch supports because he is unemployed and cannot afford to pay for the arch supports himself.  As the prison's medical policy shows, the fact that Roubideaux was unemployed would not have resulted in him being unable to obtain arch supports; it would just have required him to pay for them by having a charge assessed against his inmate account.  See Docket No. 64-6.  Mr. Roubideaux has not made out a claim for a violation of the Eighth Amendment, or of any other Constitutional right or federal law, on the arch support issue.  This court recommends granting defendants' motion for summary judgment on the arch support issue.

**E.    Retaliation by Tjeerdsma**

As discussed above, Mr. Roubideaux asserts a claim that Leland Tjeerdsma, a special security officer at MDSP, retaliated against him for filing grievances by telling Mr. Roubideaux that he should "watch what [he's] doing." In order to prove a claim of retaliation under § 1983, Mr. Roubideaux must show: (1) that he was engaged in constitutionally protected activity, (2) that

24

Officer Tjeerdsma's adverse action caused Mr. Roubideaux to suffer an injury which would "chill a person of ordinary firmness from continuing . . . in that [constitutionally protected] activity," and (3) that the adverse action was at least partially motivated by Mr. Roubideaux's exercise of his constitutional rights.  See Baribeau v. City of Minneapolis, 596 F.3d 465, 481 (8th Cir. 2010) (citing Williams v. City of Carl Junction, 480 F.3d 871, 878 (8th Cir. 2007) (quoting Carroll v. Pfeffer, 262 F.3d 847, 850 (8th Cir. 2001))).

Here, Mr. Roubideaux offers no facts in support of these three elements. In particular, he fails to contradict defendants' assertion of fact that, if Officer Tjeerdsma said anything similar to the statement attributed to him by Roubideaux, it was unconnected in any way to Roubideaux's filing of grievances.  Furthermore, as the records supplied by defendants demonstrate, Mr. Roubideaux's filing of copious numbers of grievances continued, unabated, after this June, 2010, comment allegedly made by Tjeerdsma.  Thus, Mr. Roubideaux cannot show that Officer Tjeerdsma's comment had a chilling effect on Roubideaux's exercise of his right to file grievances (if that is a constitutional right, which Roubideaux has not shown).  See Docket No. 64-1 and 6-2 (showing numerous grievances filed after the June, 2010, date attributed to Officer Tjeerdsma's comment).  The court recommends that defendants be granted summary judgment on the claim involving Officer Tjeerdsma.

**CONCLUSION**

This court respectfully recommends granting defendants' motion for summary judgment on all claims asserted by plaintiff Jeremy Roubideaux.

**NOTICE TO PARTIES**

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1)(B), unless an extension of time for good cause is obtained.  See 28 U.S.C. § 636(b)(1)(B) and Fed. R. Civ. P. 72(b)(2).  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.  Objections must be timely and specific in order to require *de novo* review by the district court.

Dated December 2, 2011.

BY THE COURT:

/s/ *Veronica L. Duffy*

VERONICA L. DUFFY
UNITED STATES MAGISTRATE JUDGE